UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DUNN AND SONNIER FLOWERS & ANTIQUES, LLC; STEPHEN RAY SONNIER, individually and as Independent Administrator of the Succession of Roy Wayne Dunn,<br><br>*Plaintiffs*,<br><br>v.<br><br>ENTERGY CORPORATION; ENTERGY NEW ORLEANS, LLC; and ENTERGY LOUISIANA, LLC,<br><br>*Defendants*. | Civil Action No. |

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Entergy Corp.; Entergy New Orleans, LLC; and Entergy Louisiana, LLC (collectively, the "Entergy Defendants"), through undersigned counsel, hereby remove the above-captioned action from the Orleans Parish Civil District Court, State of Louisiana, to the U.S. District Court for the Eastern District of Louisiana, pursuant to 28 U.S.C. §§ 1441, 1446, and 1452.

1.  On August 29, 2022, Plaintiffs Dunn and Sonnier Flowers & Antiques, LLC, and Stephen Ray Sonnier, individually and as Independent Administrator of the Succession of Roy Wayne Dunn, in Case No. 2022-07976 in the Orleans Parish Civil District Court, State of Louisiana (the "Lawsuit"), filed a Petition for Damages and Class Action Relief (the "Petition") against the Entergy Defendants.

2.  As set forth more fully below, the Lawsuit is properly removed to this Court because the Entergy Defendants have satisfied the procedural requirements for removal and

1

because this Court has subject-matter jurisdiction over the Lawsuit pursuant to 28 U.S.C. §§ 1331, 1334, and 1337.[1]

**I.   The procedural requirements for removal have been satisfied.**

3.   Entergy Corporation and Entergy New Orleans, LLC, were both served with the Petition on September 6, 2022. Entergy Louisiana, LLC, has not yet been served with the Petition. Accordingly, this Notice of Removal is timely. *See* 28 U.S.C. § 1446(b).

4.   The Orleans Parish Civil District Court is located within the Eastern District of Louisiana. Therefore, venue is proper pursuant to 28 U.S.C. § 98(a) because this is the "district and division within which such action is pending." *See* 28 U.S.C. §§ 1441(a), 1446(a).

5.   All three of the Defendants in the Lawsuit have joined in this filing. *See* 28 U.S.C. § 1446(b)(2).

6.   Pursuant to 28 U.S.C. § 1446(a), 28 U.S.C. § 1447(b), and Local Rule 3.2, copies of all process, pleadings, and orders filed into the state court record are attached as Exhibits 1 through 5.[2] Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for the Plaintiffs, and a copy is being filed with the Clerk of the Orleans Parish Civil District Court, State of Louisiana.

---

[1] The Entergy Defendants note that they removed a similar state-court putative class action on similar grounds in *Anthony J. Stewart, et al. v. Entergy Corp, et al.*, EDLA Case No. 21-cv-1834. In that case, the Honorable Eldon Fallon granted the plaintiffs' motion to remand after finding that there was no basis for federal subject-matter jurisdiction. The Entergy Defendants respectfully disagree with that jurisdictional ruling and have appealed the remand order to the U.S. Fifth Circuit Court of Appeals. That appeal is currently pending and is set for oral argument during the week of November 7, 2022.

[2] The Petition for Damages and Class Action Relief is attached as Exhibit 1. The citation issued for Entergy Louisiana, LLC, is attached as Exhibit 2. The citation issued for Entergy New Orleans, LLC, is attached as Exhibit 3. The citation issued for Entergy Corporation is attached as Exhibit 4. The Defendants' Declinatory and Dilatory Exceptions are attached as Exhibit 5.

**II.     Removal of the Lawsuit is proper because the Plaintiffs' claims present substantial, disputed questions of federal law.**

7.      "A civil suit may be removed from state court to federal court if the claim therein is one 'arising under' federal law, such that it is an action over which a district court would have original jurisdiction." *Hughes v. Chevron Phillips Chemical Co. LP*, 478 F. App'x 167, 170 (5th Cir. 2012). The Plaintiffs attempt to preempt removal of the Lawsuit by alleging in the Petition that "[n]o claim is made under any federal law." *See* Petition at ¶ 46. "However, there are instances where a claim may 'arise under' federal law and be removed to federal court, even though the plaintiff makes no federal claims." *See Hughes*, 478 F. App'x at 170.

8.      Even where a plaintiff's cause of action is created by state law, a federal question exists if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *See Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 721 (5th Cir. 2017) (quotation omitted). Accordingly, federal courts have jurisdiction over a state-law claim when "(1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities." *See id.* at 721–22 (quotation omitted). Notwithstanding a plaintiff's attempt to "frame his claims as sounding only in state law," federal jurisdiction is not defeated if "any judicial consideration of those claims necessarily implicates substantial questions of federal law." *See Hughes*, 478 F. App'x at 171.

9.      Here, the Plaintiffs' state-law negligence claims (including claims under the theories of strict liability, negligence *per se*, and *res ipsa loquitur*) necessarily turn on substantial, disputed questions of federal law, because federal law—not Louisiana law—defines the relevant standards of care. These claims are premised on the alleged "failure" of the Entergy Defendants'

"Transmission System." *See, e.g.*, Petition at ¶¶ 31, 42. As alleged by the Plaintiffs, the "Transmission System" is "an electrical superhighway" that "moves high voltage electric power via a system of distribution lines, transmission lines, and substations." *See id.* at ¶ 6. The Plaintiffs allege, among other things, that the Entergy Defendants failed to "properly design, construct, and install [the] Transmission System" and to "adequately inspect [the] Transmission System." *See* Petition at ¶ 35.

10. The Entergy Defendants' "Transmission System" is part of a larger interconnected electrical grid covering most of the United States, which "has been described as 'the most complex machine ever made.'" *Duke Energy Corp. v. FERC*, 892 F.3d 416, 417 (D.C. Cir. 2018) (quotation omitted). "[U]nlike the local power networks of the past, electricity is now delivered over three major networks, or 'grids,' in the continental United States. Two of these grids—the 'Eastern Interconnect' and the 'Western Interconnect'—are connected to each other. It is only in Hawaii and Alaska and on the 'Texas Interconnect'—which covers most of that State—that electricity is distributed entirely within a single State. In the rest of the country, any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." *New York v. FERC*, 535 U.S. 1, 7 (2002). The transmission infrastructure owned by the Defendants is part of the Eastern Interconnection, which covers "the eastern two-thirds of the United States." *See Kentucky Power Co. v. Huelsmann*, 352 F. Supp. 2d 777, 780 (E.D. Ky. 2005); *see also Texas v. U.S. Envtl. Prot. Agency*, 829 F.3d 405, 432 (5th Cir. 2016) (showing map of Eastern Interconnection). "Energy flowing onto a power network or grid *energizes the entire grid*, and consumers then draw undifferentiated energy from that grid." *New York*, 535 U.S. at 8 n.5 (quotation omitted). "All of the electric utilities in the Eastern Interconnection are electrically tied

together during normal system conditions and operate at a synchronized frequency operating at an average of 60Hz."[3]

11. This infrastructure, and the alleged actions challenged by the Plaintiffs, are subject to extensive federal regulation. Pursuant to the Federal Power Act, the Federal Energy Regulatory Commission ("FERC") has jurisdiction over all facilities for the transmission of electric energy in interstate commerce. *See* 16 U.S.C. § 824(b)(1). FERC has "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982). Critically, the Supreme Court has held that "transmissions on the interconnected national grids constitute transmission in interstate commerce." *New York*, 535 U.S. at 16; *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 63 (D.C. Cir. 2014) ("[T]he authority that [16 U.S.C. § 824(b)] affords to [FERC] has expanded over time because transmissions on the interconnected grids that have now developed constitute transmissions in interstate commerce.") (quotation omitted). Additionally, federal courts have "exclusive jurisdiction of violations of [the Federal Power Act] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, [the Federal Power Act] or any rule, regulation, or order thereunder." 16 U.S.C. § 825p. This jurisdiction is exercised in numerous ways.

12. One example that is particularly relevant here concerns federal electric reliability standards. "In 2005, Congress . . . enacted legislation requiring the development of mandatory, FERC-approved electric reliability standards." *See Alcoa Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C.

---

[3] *See* U.S. Dep't of Energy, Office of Electricity, "Learn More About Interconnections," *available at* https://www.energy.gov/oe/services/ electricity-policy-coordination-and-implementation/transmission-planning/recovery-act-0.

5

Cir. 2009). "To carry out this change, Congress added section 215 to the Federal Power Act (FPA), which provides for the creation of a national Electric Reliability Organization charged with establishing and enforcing such standards." *See id.* The North American Electric Reliability Corporation ("NERC") was subsequently certified by FERC as the nation's Electric Reliability Organization. *See id.* at 1345. Under the statutory scheme, NERC submits its proposed reliability standards to FERC for approval. *See* 16 U.S.C. § 824*o*(d). If approved by FERC, the reliability standards become binding on "[a]ll users, owners and operators of the bulk-power system" and may be enforced through penalties and compliance orders. *See* 16 U.S.C. §§ 824*o*(b)(1), 824*o*(e).[4]

13.   The NERC standards currently in force broadly regulate the planning, operation, and maintenance of electric power transmission.[5] Moreover, FERC actively enforces these standards, notably imposing fines and requiring remedial measures in situations where blackouts occur. *See, e.g.*, *Florida Blackout*, Docket No. IN08-5-000, Order Approving Stipulation and Consent Agreement, 129 FERC ¶ 61,016 (Oct. 8, 2009) (civil penalty of $25 million and required remedial measures where lack of redundancy and equipment failure resulted in widespread

---

[4] The "bulk-power system" is defined to include "facilities and control systems necessary for operating an interconnected electric energy transmission network (or any portion thereof)" and "electric energy from generation facilities needed to maintain transmission system reliability." *See* 16 U.S.C. § 824*o*(a)(1).

[5] To list only a few examples, NERC Standard TOP-001-5 establishes numerous requirements intended to prevent instability and outages in the transmission grid. *See* https://www.nerc.com/pa/Stand/Reliability%20Standards/TOP-001-5.pdf. NERC Standard FAC-003-4 establishes a detailed set of procedures requiring owners of transmission lines to maintain those lines by preventing encroachment by vegetation that could cause outages. *See* https://www.nerc.com/pa/Stand/Reliability%20Standards/FAC-003-4.pdf. NERC Standard PRC-005-1.1b establishes requirements for maintenance and testing of systems protecting electric power transmission. *See* https://www.nerc.com/pa/Stand/Reliability%20Standards/PRC-005-1.1b.pdf. NERC Standard EOP-005-3 establishes required procedures (including testing, training, and simulation exercises) for ensuring restoration of power transmission following an outage using "black start" technology. *See* https://www.nerc.com/pa/Stand/Reliability%20Standards/EOP-005-3.pdf.

blackout); *Arizona Public Service Company*, Docket No. IN14-6-000, Order Approving Stipulation and Consent Agreement, 148 FERC ¶ 61,009 (July 7, 2014) (civil penalty of $3.25 million and required equipment improvements where lack of contingency planning and equipment problems resulted in widespread blackout).

14. Notably, the New Orleans City Council—whose actions concerning the Entergy Defendants are cited throughout the Petition—passed a resolution in 2021 expressly recognizing the federal questions implicated by any investigation of whether the Entergy Defendants' operation and maintenance of transmission lines are responsible for power outages following Hurricane Ida. In Resolution No. R-21-345, the City Council requested that FERC "exercise its regulatory jurisdiction to determine whether [Entergy Louisiana LLC's] transmission line failures resulted from any violations of applicable FERC or NERC reliability standards, or otherwise might affect the interstate transmission of electricity or the bulk power system, including whether the lines were prudently operated and maintained and whether the costs of repairing any imprudently maintained interstate transmission lines should be imposed on transmission customers, all of which are outside of the Council's regulatory authority."[6]

15. In addition to being subject to the NERC reliability standards, the Entergy Defendants' transmission infrastructure has for years been controlled by a regional transmission organization that operates pursuant to a comprehensive, FERC-approved tariff (*i.e.*, license). In 2013, the Entergy Defendants became members of the Midcontinent Independent System Operator ("MISO"), which "operates in the Eastern Interconnection" and "encompasses Manitoba, Canada, and extends south across fifteen U.S. states." *See Int'l Transmission Co. v. FERC*, 988 F.3d 471,

---

[6] *See* https://cityofno.granicus.com/MetaViewer.php?view_id=&clip_id=3933&meta_id=550733.

476 (D.C. Cir. 2021); *see also Entergy Arkansas, et al.*, Docket No. ER-2339-000, 145 FERC ¶ 61243, 2013 WL 6670475, at *62316 (Dec. 18, 2013) (describing plan to join MISO).

16. The members of MISO, including the Entergy Defendants, "retain[ ] ownership and the physical operation and maintenance of their own transmission facilities." *See E. Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299, 1303 (D.C. Cir. 2007). However, "MISO [is] responsible for functional control over the transmission system, which include[s] managing transmission availability and capacity, requests for transmission service, available ancillary services, and security." *See id.*; *see also North Dakota v. Heydinger*, 825 F.3d 912, 915 (8th Cir. 2016) ("FERC requires that an approved RTO such as MISO has operational authority for all transmission facilities under its control, be the only provider of transmission services over those facilities, and have sole authority to approve or deny all requests for transmission service.").

17. "MISO controls the administration of the open access transmission tariff that sets the rates, terms and conditions of transmission service offered by MISO and the energy markets administered by MISO." *Mich. S. Cent. Power Agency v. Constellation Energy Commodities Group, Inc.*, 466 F. Supp. 2d 912, 916 (W.D. Mich. 2006). Additionally, a regional transmission organization such as MISO is "responsible for planning and directing expansions and upgrades of its grid." *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 770 (7th Cir. 2013).[7] "MISO approves infrastructure projects and allocates the costs among its member utilities in order to maintain the

---

[7] *See also MISO Transmission Owners v. FERC*, 819 F.3d 329, 331 (7th Cir. 2016) ("MISO monitors and manages the electricity transmission grid in its region (which embraces a number of mid-western and southern states, plus the Canadian province of Manitoba . . .), by balancing the load so that lines don't carry too much (or too little) power, making sure that the power can be delivered without tripping safeguards that block damage to other lines, setting competitive prices for transmission services, and planning and supervising the expansion of the electrical transmission system throughout its vast region.").

electrical grid and increase its capacity." *MISO Transmission Owners v. FERC*, 860 F.3d 837, 839 (6th Cir. 2017).

18. The FERC-approved MISO tariff,[8] which applies to the transmission infrastructure owned by the Entergy Defendants that is part of the MISO network, spans thousands of pages and extensively regulates the planning and operation of the transmission system. And "a tariff, required by law to be filed, is not a mere contract. It is the law." *Carter v. American Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966).

19. In contrast to the extensive federal regulatory scheme described above, Louisiana law provides no standards governing the design, construction, installation, maintenance, or inspection of the interstate electric transmission grid. "Therefore, as in *Tennessee Gas*, "[t]he absence of any state law grounding for the duty that the [plaintiff] would need to establish for the Defendants to be liable means that that duty would have to be drawn from federal law." *See Tenn. Gas*, 850 F.3d at 723. Because federal law, rather than Louisiana law, establishes the standards of care for the design, construction, installation, inspection, and maintenance of the Entergy Defendants' transmission infrastructure, resolution of federal questions is necessary to resolve the Plaintiffs' negligence claims.

20. Moreover, even if Louisiana law did purport to define standards of care for the design, construction, installation, inspection, and maintenance of the Entergy Defendants' transmission infrastructure, Louisiana law would be preempted to the extent that such standards or duties are different from, or inconsistent with, the applicable federal regulations. The Fifth Circuit considered an analogous situation in *Simmons v. Sabine River Authority Louisiana*, 732 F.3d 469 (5th Cir. 2013), which involved state-law tort claims against various Entergy-affiliated companies

---

[8] *Available at* https://docs.misoenergy.org/legalcontent/TariffAs FiledVersion.pdf.

9

arising from their power-generation activities at the Toledo Bend Dam. The Fifth Circuit discussed various provisions of the Federal Power Act establishing "a broad federal role in the development and licensing of hydroelectric power." *See id.* at 474 (quotation omitted). The Fifth Circuit noted that, by statute, FERC issues licenses for hydroelectric projects and requires licensees to maintain the projects according to its rules. *See id.* The Fifth Circuit also recognized "[t]he importance of a single federal agency controlling public water use and dam operations." *See id.* at 476. The Fifth Circuit held that "FERC, not state tort law, must set the appropriate duty of care for dam operators," and that "[a]pplying state tort law to set the duty of care for the operation of FERC-licensed projects would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the [Federal Power Act.]" *See id.* at 476–77 (quotation omitted). Accordingly, the Fifth Circuit held that the plaintiffs' negligence claims were preempted because they sought to apply a standard of care different from that required under the applicable federal regulations.

21. For the same reasons recognized by the Fifth Circuit in *Simmons*, federal law—in particular, the FERC/NERC reliability standards and federal tariffs (such as the MISO tariff) governing transmission operations—must set the standard of care for reliable planning, operation, and maintenance of the Entergy Defendants' transmission infrastructure. The importance of exclusive federal control in this area is at least as important as in the field of hydroelectric power. As Congress has recognized, the interconnected nature of the transmission grid means that the actions one company takes with respect to its transmission infrastructure can impact millions of utility customers across multiple states. Allowing a state-court jury to define the standard of care for these activities, based on the jury's own ideas of reasonableness, would disrupt the coherent federal regulation of an "enormously complex" interconnected system that is critically important to the nation as a whole.

22. The federal questions raised by the Plaintiffs' claims are also actually disputed. To prove their claims, the Plaintiff must prove (among other things) that the Entergy Defendants breached the applicable standards of care defined by federal law.[9] The Entergy Defendants dispute that they have breached any applicable federal statutory or regulatory standard. The content and application of the relevant federal standards are, and will continue to be, critical, disputed issues.

23. The federal questions raised by the Plaintiffs' claims are also important "to the federal system as a whole," and therefore "substantial" for purposes of establishing federal jurisdiction. *See Tenn. Gas*, 850 F.3d at 723–24. As recognized by the Federal Power Act, "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," which creates a need for federal regulation. *See* 16 U.S.C. § 824(a). Accordingly, transmission of electric energy on the interconnected, interstate grid is subject to extensive federal regulation. The Plaintiffs' broad challenge to the Entergy Defendants' design, construction, installation, inspection, and maintenance of their electric grid implicates actions that affect the supply of electricity of millions of people—an issue that has "broad significance for the federal government." *See Tenn. Gas*, 850 F.3d at 724 (quotation omitted). Moreover, to the extent that state tort law could be allowed to create inconsistent obligations for companies subject to federal regulation, that would have "significant" "implications for the federal regulatory scheme"—to put it mildly. *See id.*

24. Finally, and related to the previous point, exercising federal jurisdiction here will not "disturb the balance of federal and state judicial responsibilities," because regulation of the

---

[9] To the extent the Plaintiffs would attempt to argue that the Entergy Defendants are liable for negligence despite acting in accordance with all applicable federal standards, their claims would be preempted and subjected to dismissal. *See, e.g.*, *Simmons*, 732 F.3d at 476 (dismissing claims as preempted where the plaintiffs argued "that Defendants were negligent because they failed to act in a manner FERC had expressly declined to require").

interconnected, interstate transmission grid has not "traditionally been the domain of state law." *See Tenn. Gas*, 850 F.3d at 722, 724 (quotation omitted).

### III. Removal of the Lawsuit is also proper because the claims implicate core proceedings under the Court's bankruptcy jurisdiction.

25. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because the Plaintiffs' claims implicate core proceedings under the Court's bankruptcy jurisdiction. Accordingly, removal is proper under 28 U.S.C. § 1452.

26. On September 23, 2005, following extensive damage and power outages caused by Hurricane Katrina, Entergy New Orleans, Inc. ("ENOI"), the predecessor-in-interest to Entergy New Orleans, LLC ("ENO"),[10] filed for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Louisiana. *See In re Entergy New Orleans, Inc.*, No. 05-17697 (Bankr. E.D. La. 2005) (the "*ENOI Bankruptcy*") (Doc. No. 1).

27. ENOI filed its Fourth Amended Chapter 11 Plan of Reorganization (the "Debtor's Plan"), which was confirmed by the Bankruptcy Court and became effective on May 8, 2007. *See ENOI Bankruptcy* (Doc. Nos. 1962, 1990, 2008). With certain specified exceptions, the confirmation of the Debtor's Plan resulted in "complete satisfaction, discharge and release of all Claims arising on or before the Effective Date." *See id.* at 7. The confirmation order further provides that "such discharge will void any judgment obtained against the Debtor at any time to the extent that such judgment relates to a discharged Claim." *See id.* at 7–8.

28. Additionally, after the Effective Date, ENOI continued to exist as the "Reorganized Debtor," with its retained property being "free and clear of all Claims, Liens, charges, [and] other

---

[10] In November 2017, Entergy New Orleans Power, LLC, merged with and became a successor-in-interest to ENOI. *See ENOI Bankruptcy* (Doc. No. 2369 at 11; Doc. No. 2369-2; Doc. No. 2369-3). In December 2017, Entergy New Orleans Power, LLC, changed its name to Entergy New Orleans, LLC. *See ENOI Bankruptcy* (Doc. No. 2369 at 11).

encumbrances." *See ENOI Bankruptcy* (Doc. No. 1990 at 9). The confirmation order also adopted injunction provisions generally barring holders of discharged claims from filing lawsuits to enforce such claims. *See ENOI Bankruptcy* (Doc. No. 1990 at 8; Doc. No. 1990-1 at 53–54).

29. Even after a bankruptcy estate is closed, federal jurisdiction under 28 U.S.C. § 1334 continues as to proceedings that "arise under" title 11. *See In re Bradley*, 989 F.2d 802, 804 (5th Cir. 1993). "Courts have held that actions to enforce the discharge injunction are core proceedings" that "arise under" title 11 and establish federal jurisdiction. *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1063–64 (5th Cir. 1997); *see also In re Galaz*, 841 F.3d 316, 322–23 (5th Cir. 2016) (holding that the alleged violation of the bankruptcy court's discharge order through a subsequent state-court lawsuit "directly implicat[ed] the bankruptcy court's 'arising under' jurisdiction" and therefore gave rise to federal subject-matter jurisdiction). Thus, "a debtor may remove a case, pursuant to 28 U.S.C. § 1452, based on the need to determine whether a particular debt has been discharged." *Rhodes Life Ins. Co. v. Mendy Properties, LC*, No. 08-cv-4953, 2009 WL 1212476, at *3 (E.D. La. Apr. 30, 2009) (footnote omitted).

30. The Petition makes clear that the Plaintiffs seek to hold the Entergy Defendants, including ENO, liable for alleged negligence going back long before ENO's 2007 bankruptcy discharge. The Plaintiffs broadly challenge the Entergy Defendants' alleged failure "to properly design, construct, and install" a vast electric power transmission system that has existed for many decades. *See* Petition at ¶ 35. The Plaintiffs specifically allege that the Entergy Defendants failed to properly "buil[d]" a transmission tower that was constructed in the 1950s and that collapsed during Hurricane Ida, as well as other transmission towers that allegedly failed. *See id.* at ¶ 26. The Petition also refers to Hurricanes Katrina and Rita in 2005, and to actions allegedly taken by the Entergy Defendants in connection with and in response to these hurricanes. *See id.* at ¶ 8.

31. Because the Plaintiffs seek to hold ENO liable for claims that were discharged in bankruptcy, removal to enforce the Bankruptcy Court's discharged order and injunction is proper.

WHEREFORE, as set forth more fully above, the Entergy Defendants hereby remove the Lawsuit from the Orleans Parish Civil District Court, State of Louisiana, to this Court.

Respectfully submitted,

 /s/ Matthew J. Paul
Richard C. Stanley, 8487, T.A.
Eva J. Dossier, 35753
Matthew J. Paul, 37004
STANLEY, REUTER, ROSS, THORNTON
 & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
rcs@stanleyreuter.com
ejd@stanleyreuter.com
mjp@stanleyreuter.com

Darryl M. Phillips, 19736
Cory R. Cahn, 22984
ENTERGY SERVICES, LLC
639 Loyola Avenue, Suite 2600
New Orleans, Louisiana 70113
Telephone: (504) 576-5437
Facsimile: (281) 297-5351
dphil10@entergy.com
ccahn@entergy.com

*Counsel for Entergy Corp.; Entergy New Orleans, LLC; and Entergy Louisiana, LLC*